**In re Sulochana D. KAPINOS, Debtor.**

**Sulochana D. Kapinos, Plaintiff,**

**v.**

**Graduate Loan Center, et al., Defendants.**

**Bankruptcy No. 7-97-01593-WSR-7. Adversary No. 7-97-00142.**

United States Bankruptcy Court, W.D. Virginia, Roanoke Division.

May 11, 2000.

---

Darren T. Delafield, Law Office of Michael D. Hart, P.C., Roanoke, VA, for Sulochana Kapinos, Debtor/Plaintiff.

Howard J. Beck, Jr., Gentry, Locke Rakes & Moore, Roanoke, VA, for Graduate Loan Center and Pennsylvania Higher Educational Assistance Authority/Defendants.

## MEMORANDUM OPINION

WILLIAM F. STONE, Jr., Bankruptcy Judge.

This adversary proceeding has been brought by a young woman who seeks relief from her educational loan obligations not as a last resort after sincere but unsuccessful efforts to pay them, but before their first payments had come due and upon her realization that attempting to satisfy them would be utterly at odds with the lifestyle which she feels to be her due. It is being heard on remand from the District Court following an appeal of this Court's (Pearson, J.) determination to discharge the greatest portions of two educational debts in order to save the Debtor from "undue hardship" if she were obliged to pay them in full. While the District Court upheld this Court's conclusion that forgiveness of a portion of an educational loan is permissible under 11 U.S.C. § 523(a)(8) rather than being forced to choose between an "all or none" approach, it did return the proceeding to this Court for additional factual findings, it being of the opinion that the original findings were insufficient to justify the relief which was originally granted.

This Court has been directed to make factual findings on the first and third prongs of what has come to be called the *Brunner* test enunciated in the case of *Brunner v. New York Higher Educ. Servs. Corp., (In re Brunner)* 46 B.R. 752 (S.D.N.Y.1985), *aff'd* 831 F.2d 395 (2nd Cir.1987) to determine whether a debtor has established that payment of an educational loan obligation would subject him to an "undue hardship" within the meaning of 11 U.S.C. § 523(a)(8). The three prongs of this test are:

1. that the debtor cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loans;

2. that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion

of the repayment period of the student loans; and

　3. that the debtor has made good faith efforts to repay the loans.

The *Brunner* test was adopted by the District Court in his District in the case of *Commonwealth of Virginia State Educ. Assistance Authority v. Dillon (In re Dillon)*, 189 B.R. 382 (W.D.Va.1995) and in the appeal of this case in *Kapinos v. Graduate Loan Center (In re Kapinos)* 243 B.R. 271 (W.D.Va.2000). While approving the use of the *Brunner* analysis in this proceeding, the District Court nevertheless instructed this Court in the exercise of its equitable powers to consider also whether discharge of a portion or all of the educational loans at issue was appropriate even if the Debtor failed to establish her entitlement under the *Brunner* standard.

### *Findings of Fact*

1. The Debtor's income is insufficient to pay her living expenses required by her standard of living. Although the only pre-petition indebtedness she has been paying since her filing is upon an educational loan, which she testified that she has been paying at the rate of $85 per month, she still is not earning enough income to cover her living expenses. In addition to this loan payment she has been paying her attorney $115 per month for his services in both the case and the related adversary proceedings, including this one. To cover this shortfall she has been relying on gifts from a boyfriend of $200 or more per month and loans from her grandmother and apartment roommate which she testified have aggregated $3,000 over the last 12 months, or an average of $250.00 per month.

2. The Debtor's income has increased since the date of the original trial. Currently she earns approximately $9.50 per hour in her job as a Financial Services Representative at National Commerce Bank and works 40 hours a week. Assuming a work year of 2000 hours, the Debtor now earns at a current gross annual rate of $19,000, which is equal to a monthly gross income of $1,583. She testified that her normal take-home pay is $1,250 per month and in the absence of any challenge to the figure, it is accepted as correct.

3. The Debtor has a B.S. Degree in hospitality management from Nova Southeastern University. After the Debtor dropped out of law school and moved to Roanoke, however, she did not seek a job in this field, in which she had been employed before entering law school, but went to work in banking as a customer service representative. She did not apply for any type of management trainee position. When the Court inquired of the Debtor whether her educational training would qualify her for a position as a manager or assistant manager for a motel or hotel chain, she expressed some doubt about her ability to obtain a management position but stated candidly, "To tell you the truth, your Honor, I didn't want to go back into that industry." (T.47) This answer was consistent with a theme which ran through her testimony of an individual who has been less interested in maximizing her income and minimizing her living expenses than she has been in maintaining a lifestyle, including choice of job, that she considers appropriate and most appealing to herself irrespective of its financial consequences.

4. The Debtor has not sought any part-time employment to supplement her income and when questioned about this possibility, it didn't appear to the Court that she had ever seriously considered doing so.

5. The Debtor lives in what she admits to being a "luxury" apartment complex known as The Summit, which has amenities such as a swimming pool, beautiful view, hiking trails, and exercise equipment. She testified that she wants to live in such a complex because she believes it to be safe and secure. Although basic cable t.v. service is included in her monthly rent, she subscribes to a premium service at an extra cost of $50 per month because she explains it serves as her only real entertainment as she makes no use of the amen-

ities available in the complex. She has reduced her original rent expense of $695 by moving to a 3-bedroom unit at $810.00 per month but obtaining a roommate who splits the expense with her. She testified that the roommate was unwilling to share a 2-bedroom apartment with her. According to the Debtor her current monthly expenses are as follows

| | |
|---|---|
| Rent (½) | 400.00 |
| Premium cable tv (½) | 25.00 |
| Clothing | 50.00 |
| Laundry & dry cleaning | 50.00 |
| Medical & dental | 80.00 |
| Barber/stylist/personal hygiene | 30.00 |
| Educational loan payment | 85.00 |
| Car payment | 298.00 |
| Car operation & maintenance | 100.00 |
| Heat & electricity | 120.00 |
| Telephone | 40.00 |
| Food | 200.00 |
| Property tax on car | 40.00 |
| Legal expense | 115.00 |
| Insurance | 80.00 |
| Gifts | 10.00 |
| Misc., emergency, etc. | 75.00 |
| Total | 1,798.00 |

Based on her testimony of average income or other receipts of $1,250 (salary) + $200 (gifts from boyfriend) and $250 (loans from grandmother & roommate) = $1,700 per month, she either has somewhat higher income and/or lower expenses than reported of approximately $100.00 per month. The Debtor also testified that she received a tax refund for 1999 in the amount of approximately $300 per month.

6. A few months before she left law school, the Debtor's car was involved in a crash and she had to acquire a new one. She bought a new Honda Civic automobile for which she has a monthly payment of $298.00, which she testified will be paid off at the end of this year. She testified that having a reliable car was very important to her, just as was living in a secure apartment community, and that she would need to replace her car with another when she would lose confidence in its reliability.

7. The Debtor is 30 years old, in good health and married but has been separated from her husband for several years and has no children or other dependents. She testified that her husband won't get a divorce and she cannot afford to do so. She was an assured witness who certainly appears to have the intelligence, personality and personal appearance and presence to be successful in a business or professional environment.

8. Counsel for the Debtor introduced into evidence copies of IRS collection guidelines used to determine allowable maximum living expenses in establishing monthly payment arrangements for delinquent taxpayers. These guideline amounts for 1 or 2 individual(s) per month are as follows:

| | Max. Allowance |
|---|---|
| Housing & utilities | $642 (Roanoke City) |
| | 802 (Roanoke County) |
| Car ownership costs | 391 (National) |
| Car operating costs | 235 (South Region) |

No testimony was offered and the Court's attention was not directed to any regulatory pronouncement or case authority that would equate the standard of living permitted by these guidelines with the "minimal" standard of living contemplated by the *Brunner* test. Other than these guidelines no testimony or other evidence was offered to establish the reasonable cost to an individual to provide a "minimal standard of living" for herself in this area.

9. The Debtor filed her petition on April 25, 1997, which was approximately 4 months after she left law school in December of 1996 and prior to any payments coming due on the loans at issue in this adversary proceeding. She made no payments on the loans in question and did not explore any deferments, loan repayment arrangements, or partial loan forgiveness possibilities with the creditors concerning these loans before filing this proceeding on July 22, 1997. As a result of her petition, the Debtor has been relieved of approximately $25,000 in pre-petition credit card debt which had required approximately $600.00 in monthly payments.

10. The two loans at issue in this adversary proceeding have principal unpaid balances of $19,768.10 and $25,269.97. In a

separate adversary proceeding an educational loan owing to EDUCAP in the amount of $3,767.14 was discharged except to the extent of $753.48 to be repaid over 5 years without interest.

11. The Debtor enjoys what is certainly more than a "minimal standard of living" but this is made possible for her by the generosity of her boyfriend, grandmother and roommate. Without these various sources of financial support, she would be obliged either to reduce her standard of living or increase her income or both. The Court simply hasn't been furnished with sufficient evidence for it to make any reliable factual findings as to the reasonable expense of a "minimal standard of living" for a young woman living in or near Roanoke, Virginia. The Court is satisfied, however, that the Debtor's current level of income is insufficient to permit her to provide for her own support and to pay the educational loans in issue with interest within any reasonable period of time.

12. The Debtor has the ability and opportunity to increase her income either by requesting overtime from her present employer (T.23), or obtaining a second job (T.49), or exploring other employment possibilities which would produce more income.

### Conclusions of Law

■ 1. Determination of the dischargeability or non-dischargeability of a debt is a "core" bankruptcy proceeding pursuant to 28 U.S.C. § 157(b)(2)(1). Because educational loans are not dischargeable unless the debtor establishes that refusal to discharge them would impose an "undue hardship" upon the debtor and his dependents, the debtor bears the burden of proving the contention of "undue hardship." *Commonwealth v. Dillon, supra,* 189 B.R. at 384 (W.D.Va.1995). Because the determination of "undue hardship" is mainly a forward-looking enterprise, this Court has directed its attention to the facts existing as of the date of hearing on remand, April 17, 2000, rather than the date of filing or of the original trial.

2. The Debtor has not carried her burden of proof that discharge in full of the educational loans in issue in this proceeding is necessary to avoid subjecting her to an "undue hardship" within the meaning of 11 U.S.C. § 523(a)(8).

■ 3. It is appropriate and certainly within the intention of Congress that a debtor be required to produce the level of income which is reasonably possible for her to achieve before concluding that she would suffer an "undue hardship" if required to pay her educational loans. *Rice v. United States of America (In re Rice),* 78 F.3d 1144, 1150 (6th Cir.1996). Although this opinion dealt with discharge of "HEAL" loans, which are subject to a somewhat different standard of dischargeability, the Court believes the principle to be equally applicable in this case.

■ 4. As suggested by Defendant's counsel in his closing argument, there is no basis to find that the Debtor has carried the third prong of the *Brunner* standard of proving that she has made "good faith efforts to repay the loans" when she has affirmatively established that she made no efforts to make any payments upon them before seeking their discharge. While she further explains that she had no money left after her living expenses to make loan payments, such excuse is not justification under the *Brunner* standard.

■ 5. The ultimate standard which must govern this Court's determination is the one provided by Congress in 11 U.S.C. § 523(a)(8) of "undue hardship." The *Brunner* test is simply a means of assisting the Court in determining whether an "undue hardship" has been established, not the sole way of doing so. For example, if the evidence disclosed that a debtor had suffered a terrible permanent incapacitating injury or illness prior to making any efforts whatsoever to pay on an educational loan, certainly the statutory standard of "undue hardship" would be satisfied even

though the *Brunner* test would not be. In other words, what is an "undue hardship," a phrase of art rather than a clearcut objective standard, is dependent upon the facts of the particular case. While the Court doesn't doubt that a debtor's good faith is relevant in the context of requested discharge of an educational loan, it believes that a more appropriate statement of this requirement is, "Do all of the debtor's past conduct, current circumstances, and reasonable future prospects when considered in the aggregate satisfy the Court of the debtor's good faith in claiming that paying the educational loan(s) would subject the debtor and her dependents, if any, to undue hardship?"

6. This Court has the authority under 11 U.S.C. § 105(a) to grant partial relief to the Debtor as to a portion of the principal of the debt or as to interest upon the debt or any portion of same. This Court may also deny relief to the Debtor with leave granted in the future to reopen her case and either reopen this adversary proceeding or file a new one raising the same issues but based on the Debtor's then existing circumstances.

7. Based on all of the circumstances of this Debtor and the balances of the two loans in question, the Court believes that the following resolution is appropriate to the facts presented and the intention of Congress to require payment of educational loans unless "undue hardship" is established:

A. All interest on the loans in issue either already accrued or to accrue between the date of this ruling and June 1, 2005 is hereby discharged, together with liability for all attorney's fees and other collection expenses incurred by the creditors heretofore or incurred hereafter in the course of this adversary proceeding, including any appeals thereof.

B. The Debtor shall make an aggregate loan payment of $200.00 each month beginning July 1, 2000 upon the educational loans at issue in this adversary proceeding, to be allocated among them pro rata or as the affected creditors may otherwise agree and to be applied against the principal.

C. Upon any failure by the Debtor to make any payment within 30 days of its due date, the full then unpaid balances of the loans, at the option of the creditors, shall become due and payable. In such event interest shall again begin to accrue upon such loans at the contract rates thereof from and after the date such option is exercised.

D. If all payments are made for a term of 60 months, the remaining balances of such loans shall again begin to accrue interest at the applicable contract rates as of June 1, 2005.

E. If the Debtor and the creditors do not enter into a voluntary agreement concerning the resolution of the Debtor's remaining indebtedness by June 1, 2005, the Debtor may reopen her case and this adversary proceeding or file a new one and request the Court to discharge all or any portion of her remaining indebtedness upon proof of "undue hardship" based on her then circumstances and reasonable prospects.

F. The Debtor is further free at any time hereafter to file a Chapter 13 petition to seek a different payment arrangement than the one provided in this ruling upon such terms as the Court may approve by confirming a proposed plan. She may also reopen her case and this adversary proceeding at any time to establish that by reason of a material adverse change in her health and/or other relevant circumstances she is unable to continue making the payments required by this decision.

An order in accordance with this Opinion shall be entered contemporaneously.