**In re Sheila WEIR, Pro se, Debtor.**

**Sheila Weir, Plaintiff,**

**v.**

**Rod Paige, Secretary of Education, the United States Department of Education, Defendants.**

**Bankruptcy No. 00–36021–T.**
**Adversary No. 01–3103–T.**

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

March 29, 2002.

Sheila Weir, Richmond, VA, Pro se.

Henry W. McLaughlin, III, Richmond, VA, for Debtor.

Bruce E. Robinson, South Hill, VA, trustee.

## MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Chief Judge.

Trial was held on February 1, 2002, on debtor's complaint for determination of dischargeability of student loan debts held by defendants, Rod Paige, Secretary of Education, and the United States Department of Education (Department of Education). The court deferred ruling at trial, giving debtor the opportunity to enter into a payment agreement with the Department of Education. If no agreement could be reached, the court requested that defendant submit proposed findings of fact and conclusions of law. The Department of Education filed its proposed findings of fact and conclusions of law on February 12, 2002. Debtor never filed any response.

For the reasons stated herein, the court will dismiss debtor's complaint.

### Findings of Fact.

Debtor filed this chapter 7 petition pro se on November 13, 2000, and was discharged on February 28, 2001. Debtor is currently forty-six years old, in good health, has no disabilities, and has no current medical expenses. She has one dependent, a thirteen year old daughter, who

is also in good health and has no disabilities.

Debtor was last enrolled in college in August 1997. Debtor currently possesses an Associates of Arts degree in Education from Saint John's University, a Bachelors of Arts degree in Political Science from Virginia Commonwealth University, and a two year Certificate in Criminal Justice also received from Virginia Commonwealth University.[1]

Debtor last worked a full-time job as a program coordinator for Virginia Commonwealth University from June 1996 to November 1996. Debtor's last place of compensated employment was at Virginia Commonwealth University in the survey and evaluation research laboratory from July 1999 to January 2000, where she worked twenty hours per week. From 1994 to June 1998, debtor worked as a substitute teacher for Richmond public schools, with weekly hours worked ranging form seven to thirty-five.[2]

Currently, debtor volunteers twenty hours per week with Central Virginia Legal Aid Society and home-schools her thirteen year old child.[3] Her sources of income include temporary employment, subsidized housing, public assistance, and unemployment. Specifically, debtor receives public assistance in the form of Temporary Assistance to Need Families (TANF) in the amount of $254.00 per month, food stamps equaling $239.00 per month, Medicaid, and Section 8 housing assistance, which pays all but $50.00 of debtor's rent. Debtor does not receive any child support or alimony. Debtor has no checking or savings account. Debtor's current household expenses are approximately $300.00 to $400.00 per month.[4]

Between November 1990 and July 1992, debtor obtained eight federally guaranteed student loans (Stafford and SLS) for the purpose of attending Virginia Commonwealth University. The loans were declared in default in December 1996 and were assigned to the Department of Education in July 1997.[5] As of February 1, 2002, the amount owed on the guaranteed student loans totaled $25,098.58.[6] Debtor

1. Debtor received her B.A. in Political Science in 1993 and her two-year certificate in Criminal Justice in 1997.

2. Debtor's employment with Richmond Public Schools ceased when she was no longer called by them. Debtor testified that she did not pursue the reason she was no longer called because she had no transportation.

3. Debtor has volunteered for Legal Aid since 1989. Debtor began home-schooling her daughter in April 2001.

4. The figures are based on debtor's complaint filed June 12, 2001. However, in companion case, Adversary Proceeding No. 01–3104–T, debtor listed in her interrogatories her household expenses as: 1) electricity—$100.00, 2) heat—$60.00 and 3) groceries—$150.00. However, because she receives food stamps in the amount of $239.00 per month and pays $50.00 per month in rent, the court has determined that her monthly expenses actually to-

tal approximately $210.00. Debtor thus has an excess of income over expenses in the amount of $44.00.

5. The loans were originally taken out with a Department of Education lender and guaranteed by a guarantee agency. In the event of a default, the guarantee agency pays the original note holder the money owed. The note is then assigned to the Department of Education who attempts to collect the debt from the borrower.

6. Debtor also obtained other student loans directly from the U.S. Department of Education under the William D. Ford Direct Loan Program with a value of $39,983.91 as of July 31, 2001. At trial, debtor stated that these loans are not at issue in this case, and that she is not seeking to have the direct loans discharged. The loans are currently in repayment status on the income contingent repayment plan, which requires no payment from debtor based on her current lack of income.

has never made a voluntary payment in any amount toward the loans. The only payments that the Department of Education has received have occurred through offsets of debtor's income tax refunds for tax years 1997 and 1998.[7]

Debtor has refused to explore any of several repayment options offered by the Department of Education to cure the default status of the loans. As early as July 1997, the Department of Education sent letters to debtor inviting her to "contact a Department of Education customer service representative ... to find out ... [about] loan 'rehabilitation' and 'consolidation programs' as well as, [its] income contingent repayment plan." Debtor received no fewer than eighteen letters from 1997 to 2000, and debtor never attempted to discuss any of her options with the Department of Education. Debtor did contact the Department of Education via telephone and letter, but only for the limited purpose of arguing that the loans had been declared to be in default improperly.

The repayment options available to debtor include the opportunity to obtain a Direct Loan Consolidation, wherein a Direct Loan through the William D. Ford Direct Loan Program would be made to pay off the defaulted loans. At that point debtor would be eligible to participate in an income contingent repayment plan, under which the monthly payment on the loan is determined based on the number of individuals in the household, the amount of adjusted gross income, and the amount of the loan. Under the income contingent repayment plan, debtor's monthly payment would amount to zero.[8] At the expiration of twenty-five years, any unpaid balance on the loan is written off.

In the alternative, the Department of Education offers a "reasonable and affordable" payment plan based on debtor's verified financial statement which accounts for the actual expenses of a debtor. During the course of litigation, counsel for the Department of Education repeatedly offered these options to debtor to repay her loans. Debtor failed or refused to respond to the invitations.[9] During trial, counsel for the Department of Education asked debtor whether she would be willing to accept the income contingent repayment plan, and debtor equivocated.

### Debtor's Complaint.

On June 12, 2001, debtor filed adversary proceeding number 01–3103–T against Rod Paige, Secretary of Education, and the United States Department of Education to determine dischargeability of student loan debt based upon undue hardship pursuant to § 523(a)(8) of the United States Bank-

---

7. The amount of the offsets were $1,059.77 for 1997 and $963.61 for 1998.

8. Debtor's monthly payment is calculated annually based generally on the adjusted gross income as reported on the debtor's U.S. individual income tax return. The most a debtor can be required to pay under this plan is 20% of discretionary income, which is the difference between debtor's adjusted gross income and the poverty level income established by the Department of Health and Human Services.

9. On January 10, 2002, counsel for the Department of Education faxed and mailed debt-
or a proposed consent order which would require debtor to participate in the income contingent repayment plan and resolve this adversary proceeding. On January 14, per debtor's request, counsel for the Department of Education faxed and mailed debtor information regarding the income contingent repayment plan and asked debtor to contact him. Counsel also left voicemail messages for debtor to let her know that the package had been faxed and mailed. Debtor never contacted counsel for the Department of Education.

ruptcy Code.[10] In her complaint, debtor states that the Department of Education incorrectly declared the notes to be in default on March 20, 1997, while she was still in school.

On October 10, Department of Education filed an answer to debtor's complaint to determine dischargeability of student loans asserting that: 1) debtor has failed to state a claim upon which relief can be granted, 2) the proper party defendant to the proceeding is the United States of America, and 3) lack of undue hardship.

At trial on February 1, 2002, the court deferred ruling to give debtor a chance to enter into a payment agreement with the Department of Education.[11] The court advised counsel for the Department of Education to attempt to work out a payment arrangement with debtor, and if one could not be worked out, then counsel was advised to file proposed findings of fact and conclusions of law. When permitted the opportunity to explore payment options at the conclusion of trial, while the case was under advisement, debtor again refused.

### Conclusions of Law.

■ Student loans are generally nondischargeable. However, the exception to this rule allows student loans to be discharged for undue hardship. 11 U.S.C. § 523(a)(8) (2001). Bankruptcy Code § 523 provides in relevant part:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
>
> ...
>
> (8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit of nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents;

11 U.S.C. § 523(a)(8) (2001).

### I. Undue Hardship

■ Section 523(a)(8) creates a presumption of nondischargeability, and the burden of establishing that student loans are dischargeable is on the debtor. *United States v. Wood,* 925 F.2d 1580, 1583 (7th Cir.1991)(*citing Buford v. Higher Educ. Assistance Found.,* 85 B.R. 579, 581 (D.Kan.1988)). There is no definitive test to determine whether repayment of a stu-

10. On June 21, 2001, the clerk of court issued a summons and notice of pretrial conference, which was improperly served on defendants. The summons required defendants to file a motion or answer within thirty days of June 21 and also scheduled a pretrial conference for August 8, 2001. The pretrial conference scheduled on August 8, 2001, was continued to allow debtor to file a motion for default judgment. On August 9, 2002, the court issued a confirmation of request for hearing on motion for default judgment, requiring that debtor file a Notice of Hearing and Certification of Service within five days. Though debtor dated the Notice of Hearing August 14, 2001, the court's date stamp reflects a filing date of August 16, 2001. On August 30, 2001, counsel for the Department of Education and Rod Paige filed a response to debtor's motion for default asserting that debtor failed to properly serve defendants with process as required by Fed. R. Bankr.P. 7004. Pre-trial conference and hearing on debtor's motion for default judgement was held on September 4. Debtor's motion for default judgment was denied for improper service by order entered October 11.

11. At the conclusion of debtor's evidence, counsel for the Department of Education moved for judgment as a matter of law stating that debtor had not met her burden of undue hardship, and the court took this motion under advisement.

dent loan will impose undue hardship on a debtor. In fact, Congress did not define "undue hardship" in the Bankruptcy Code. The phrase "was lifted verbatim from the draft bill proposed by the Commission on the Bankruptcy Law of the United States." *Brunner v. New York State Higher Educ. Servs. Corp. (In re Brunner)*, 46 B.R. 752, 754 (S.D.N.Y.1985), *aff'd*, 831 F.2d 395 (2d Cir.1987).

"The Commission's report provides some inkling of its intent in creating the exception, intent which in the absence of any contrary indication courts have imputed to Congress." *Id.* In enacting Section 523(a)(8), the Commission intended to make the discharge of student loans more difficult than other debt. *Brunner*, 831 F.2d at 396. The Commission envisioned the determination of undue hardship as a calculation encompassing whether the amount and reliability of income and other wealth which the debtor could reasonably be expected to receive in the future could maintain the debtor and his or her dependents at a minimal standard of living as well as pay off the student loans. *See id.* (discussing *Report of the Commission on the Bankruptcy Laws of the United States*, House Doc. No. 93–137, Pt. I, 93d Cong., 1st Sess. 140 n. 16 (1973)).

Courts have determined that undue hardship must "mean more than unpleasantness associated with repayment of a just debt" and that "dischargeability of student loans should be based upon a 'certainty of hopelessness.'" *Jones v. Nat'l Payment Ctr. (In re Jones)*, 242 B.R. 321, 325 (Bankr.E.D.Va.1998) (citing *In re Lezer*, 21 B.R. 783 (Bankr.N.D.N.Y.1982)); *see also In re Kohn*, 5 Bankr.Ct.Dec. 419, 20 C.B.C. 994 (Bankr.S.D.N.Y.1979) (stating that Congress meant the discharge of student loans to be an available remedy to those severely disadvantaged economically as a result of factors not within the control of the debtor which are so much a part of the debtor's life, present and in the foreseeable future, that the expectation of payment is virtually non-existent unless the bankrupt is stripped of all that makes life worth living).

Courts within the Fourth Circuit have not adopted a definitive test to determine whether repayment of a student loan will impose an undue hardship. *See Kapinos v. Graduate Loan Ctr. (In re Kapinos)*, 243 B.R. 271, 275 (W.D.Va.2000). Lower courts within the Fourth Circuit have used a variety of tests. Some courts have adopted a three part test which was set out by the Second Circuit Court of Appeals in *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir.1987).[12] *See, e.g., In re Kapinos*, 243 B.R. at 274; *Ammirati v. Nellie Mae, Inc. (In re Ammirati)*, 187 B.R. 902, 905 (D.S.C.1995), *aff'd*, 85 F.3d 615 (4th Cir. 1996); *Walcott v. USA Funds, Inc. (In re*

---

**12.** The *Brunner* test requires a three part showing:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*In re Brunner*, 831 F.2d at 396. It appears that the national trend is toward adoption of the *Brunner* standard. *See Ammirati v. Nellie Mae, Inc. (In re Ammirati)*, 187 B.R. 902, 905 (D.S.C.1995), *aff'd*, 85 F.3d 615 (4th Cir.1996) (noting courts in the Second, Sixth, Seventh, Eighth and Eleventh Circuits have adopted the *Brunner* standard). The Fourth Circuit Court of Appeals has recently used this test on a Virginia case in an unpublished opinion. *See Kasey v. Pennsylvania Higher Educ. Assistance Agency (In re Kasey)*, 187 F.3d 630, 1999 WL 507274 (4th Cir.1999) (unpublished opinion).

*Walcott),* 185 B.R. 721, 724 (Bankr. E.D.N.C.1995).

Other courts have taken into account a group of relevant factors, *see, e.g., In re Wilson,*[13] 177 B.R. 246, 248 (Bankr.E.D.Va. 1994), or have employed a case-by-case analysis focusing on the existence of extraordinary or unique circumstances, *see Ballard v. Commonwealth of Virginia, ex rel. State Educ. Assistance Auth. (In re Ballard),* 60 B.R. 673, 674 (Bankr.W.D.Va. 1986).

 Regardless of the test used in determining whether repayment of student loans constitutes undue hardship under § 523(a)(8), at a minimum the court must focus on two issues: (1) the economic prospects of the debtor and (2) whether the conduct of the debtor disqualifies the debtor from taking advantage of the exception. *See* Andrew M. Campbell, Annotation, *Bankruptcy Discharge of Student Loan on Ground of Undue Hardship under § 523(a)(8)(B) of Bankruptcy Code of 1978 (11 U.S.C.A. § 523(a)(8)(B)) Discharge of Student Loans,* 144 A.L.R. Fed. 1, 31, 1998 WL 174676 (1998). Undue hardship is not based on a present inability to pay "but rather upon a 'certainty of hopelessness that future payments cannot be made.'" *In re Love,* 33 B.R. 753, 755 (Bankr. E.D.Va.1983) (citations omitted).

### a. Economic Prospects of the Debtor.

With regards to the current and future economic prospects of the debtor, courts have considered (a) whether or not the debtor has dependents, (b) the income level of debtor, (c) the health of debtor and dependents (if any), and in the case of debtors with dependents and low income, (d) the education level of debtor. *See* Andrew M. Campbell, Annotation, *Bankruptcy Discharge of Student Loan on Ground of Undue Hardship under § 523(a)(8)(B) of Bankruptcy Code of 1978 (11 U.S.C.A. § 523(a)(8)(B)) Discharge of Student Loans,* 144 A.L.R. Fed. 1, 31, 1998 WL 174676 (1998).

1. Dependents—The debtor does have a thirteen year old child who financially relies on her. She has no one who will financially help her.

 2. Income Level—Debtor currently receives housing for $50.00 per month, $239.00 per month in food stamps and $254.00 per month in unemployment benefits. Debtor testified that she does not receive any child support or alimony. There is no indication of any other sources of income or wealth. According to debtor, she has been unsuccessful in obtaining full-time employment since 1998 because she cannot afford a car[14] and is unable to secure alternate transportation.[15] While it

**13.** Relevant considerations discussed in *In re Wilson* include:

(a) employment status; (b) other sources of wealth; (c) current income required to maintain a minimal living standard; (d) whether the debtor's education and skills are being used to their best advantage; (e) the health of the debtor and any dependents; (f) living expenses; (g) future financial resources; (h) good faith of the debtor; and (i) whether the bankruptcy was filed merely to avoid the student loan obligation. *In re Wilson,* 177 B.R. at 248 (citing *Armijo v. New Mexico Student Loan Program (In re Ar-*

*mijo),* 13 B.R. 175, 177–78 (Bankr.D.N.M. 1981)); *In re Jones,* 242 B.R. at 325–26.

**14.** Debtor testified that she is unable to afford a car because the Department of Education is offsetting her income tax refunds, which are comprised primarily of earned income credits, because of defaulted student loans. Debtor stated at trial that the tax refunds would pay for insurance and maintenance on a car.

**15.** At trial in companion case, Adversary Proceeding No. 01–3104–T, on November 2, 2001, debtor testified that she currently resides outside the range of public transit, and

is clear that debtor's current income level certainly indicates impoverishment, in determining undue hardship, a court must also look to future income possibility.

3. Health—Neither debtor nor her dependent child suffers from any health problems.

**b. Good Faith Conduct of the Debtor.**

With regard to the debtor's conduct, courts have analyzed whether debtor has made a good faith effort to pay off the student loans by (a) maximizing income, (b) minimizing expenses, and (c) attempting to make payments upon the loans or negotiate deferrals of loan payments in lieu of bankruptcy. *See id.* at 34. In addition, courts have considered whether the discharge of the debtor's student loans would be consistent with the policy of Congress in restricting the discharge of student loans by considering whether the dominant purpose of the debtor in filing bankruptcy was to discharge the student loans. *See id.*

■ 1. Good faith attempts to maximize income require the debtor to take advantage of opportunities for work when it has been available and diligently look for work, whether or not in the debtor's chosen field, when it has not been available. In order to collect unemployment, debtor is required to provide proof of attempted employment; therefore, the court was able to look at debtor's attempts. For the past several years debtor has applied for paying employment in sporadic spurts without any success.

Debtor's documentation reveals that the last time she submitted a job search form

to the Department of Social Services was August 2000. Debtor currently volunteers twenty hours per week with Central Virginia Legal Aid. She testified that she is unable to secure full-time employment because she cannot afford a car. At trial, debtor testified that she lives within three-fourths of a mile of public transportation, but considers this distance too far to walk.

■ 2. Good faith attempts to minimize expenses require that the debtor economize and avoid excessive or lavish expenditures. Debtor does not own anything that is not protected by her homestead exemption. There is no place in her budget for luxuries such as vacations or other forms of entertainment.

Debtor does not currently subscribe to cable television. However, she listed Comcast Cablevision on her bankruptcy petition as a creditor and admitted at trial that during the period that her student loans have been in default, she subscribed to cable television services. In 1998, the cable service provider disconnected debtor's service after debtor accrued approximately $250.00 in unpaid cable fees. Debtor also admitted at trial to having more than basic telephone service, including call intercept, caller ID, and voice messaging.

■ 3. Good faith attempts to repay loans require debtor to have made payments when he or she was in a position to make such payments. While in school debtor received deferments. Debtor has not been enrolled in college since August 1997. Debtor has never made any voluntary payments to the Department of Education for her student loans. The only payments that the Department of Edu-

---

is unable to consistently find someone to drive her to work. Debtor also stated at trial that she cannot move into the range of public transit as she does not have enough money for a security deposit that is required by many

housing developments. However at trial held on February 1, 2002, in the instant case, debtor testified that she lived within three-quarters of a mile of public transportation, but considered that distance too far to walk.

cation has received have occurred through offsets of debtor's income tax refunds for tax years 1997 and 1998.

Congressional intent in enacting restrictions on the discharge of student loans was to prevent debtors from using student loans to obtain a higher education and then declaring bankruptcy to discharge the loans. *See id.* at 35. Courts have usually refused to discharge student loans when they are the bulk of the debtor's debt or when student debt is the first or second largest single type of debt. *See id.*

However, in some cases, courts have found that the policy behind the restrictions on the discharge of student loan debt is not violated despite student loan debt comprising the bulk of debtor's debt by examining the following factors: 1) whether several years have elapsed between the date the loan payments became due and the bankruptcy filing, 2) whether debtor has made payments on the loan, or 3) whether the debtor's financial affairs are distressed. *See id.*

In this case, 83% of the unsecured debt is related to education.[16] Debtor's dominant purpose in filing bankruptcy was clearly to discharge the student loans although several years had elapsed between the date the loan payments became due and the filing of the bankruptcy petition. Debtor has not made any payments on these loans.

■ Education loan dischargeability cases under § 523(a)(8) are difficult for courts. In most cases, as in this case, debtors present more or less compelling circumstances of financial adversity with which courts can sympathize. However, this is an area of debt where Congress has

pointedly stated that discharge will be subject to a very stringent test. After carefully considering every aspect of debtor's evidence, I must conclude that she has not carried her burden of proof to establish the discharge of the Department of Education's loans.

While it does not appear that debtor can maintain, based on her current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loans, the test requires that debtor meet all three conditions to receive a discharge under § 523(a)(8). Debtor is in good health; she is highly skilled and well-educated, possessing several degrees. Debtor did not present sufficient facts to show, by a preponderance of the evidence, that her present circumstances are likely to exist for a significant portion of the repayment period.

Debtor's evidence also falls short on the issue of good faith. For one thing, in spite of her abilities she seems unwilling to secure gainful employment to improve her financial situation. This seeming unwillingness to secure gainful employment is directly adverse to a good faith attempt to maximize income. Thus, her situation does not present a "certainty of hopelessness" for future financial prospects. *In re Love*, 33 B.R. at 755 (citations omitted).

Equally important, however, is debtor's lack of good faith efforts to repay the loans. Not only has debtor not made any effort to repay any portion of these loans, but she has repeatedly refused various repayment options that have been offered to her.

From 1997 to 2000, debtor received approximately eighteen letters from the De-

---

**16.** Total liabilities listed on the debtor's bankruptcy schedules are broken down as follows: $61,701.91 due on student loans ($12,708.28 ECMC, $15,714.78 New York Higher Edu- cation Services, $30,625.87 Department of Education, $2652.98 VCU/EFG Technologies); and ($12,305.58 due on unsecured nonpriority claims).

partment of Education encouraging her to explore various repayment options, and debtor never attempted to discuss any of these options with the Department of Education. In addition, throughout the course of this litigation, during trial, and even after trial while the matter was under advisement, counsel for the Department of Education continued to offer debtor repayment options, and debtor failed or refused to respond to the invitations. Debtor's refusal to explore the various repayment options presented to her by the Department of Education is further evidence of her lack of good faith. Accordingly, the court finds that debtor is not entitled to a discharge of the subject student loans.

An order will be entered granting judgment for the Department of Education and dismissing the complaint.