In re Jennifer L.L. MURPHY, Debtor.

Jennifer L.L. Murphy, Plaintiff,

v.

CEO/Manager, Sallie Mae, CEO/Manager, United Student Aid Funds CEO/Manager, Great Lakes Higher Education Corp., CEO/Manager, Educational Management Corp., CEO/Manager, Help Service Group, Inc., CEO/Manager, Eastern Virginia Medical School, CEO/Manager, University Accounting Services, LLC, CEO/Manager, U.S. Department of Education, John Ashcroft, U.S. Attorney, U.S. Department of Justice, Office of the U.S. Attorney, U.S. Department of Justice, Defendants.

Bankruptcy No. 03–72186–SCS.
Adversary No. 03–7101–SCS.

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

Feb. 23, 2004.

Duncan R. St. Clair, III, Duncan R. St. Clair, III & Assoc., P.C., Norfolk, VA, for Debtor.

## MEMORANDUM OPINION AND ORDER

STEPHEN C. ST. JOHN, Bankruptcy Judge.

This matter came for trial January 13, 2004 on Complaint of Jennifer Murphy for Hardship Discharge. At the conclusion of the trial, this Court took the matter under advisement. This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(I) and 1334(b). Venue is proper pursuant to 28 U.S.C. § 1409(a).

### PARTIES AND PROCEDURAL HISTORY

Jennifer Murphy ("Murphy") filed an individual Chapter 7 petition on March 23, 2003. She received a discharge of her dischargeable debts on July 3, 2003. To finance her education at Virginia Polytechnic Institute and two years of medical school at Eastern Virginia Medical School, Murphy had taken out loans under various programs, including loans guaranteed by the United States through its Department

of Education. Murphy has not taken any action to consolidate these loans under any public or private program. On June 20, 2003, Murphy filed an adversary proceeding with the Bankruptcy Court, praying that her student loans be discharged.

In her complaint Murphy asserted that her oldest child, Kayla Murphy, was afflicted with Pfeiffer Syndrome. Compl. ¶ 6. Because of her daughter's medical condition, Murphy claims that she has been forced to discontinue medical school and is unable to work due to the daily requirements involved in caring for her daughter. Compl. ¶ 4–7. Accordingly, Murphy requests a discharge due to the undue hardship associated with the repayment of her student loans. Prior to trial, Murphy, through counsel, submitted an Agreed Stipulation of Facts.[1]

## FINDINGS OF FACT

Murphy was the sole witness at trial.[2] In Schedule E of her Bankruptcy petition, Murphy listed sixteen creditors as holding unsecured nonpriority claims. The total amount of these sixteen debts was $119,974.00. Murphy listed no secured or priority creditors and asserted that she had no income. The total amount of assets claimed on the debtor's Chapter 7 petition was $1,186.00, consisting entirely of small personal items. Def. Ex. G. Schedule J of the debtor's Chapter 7 petition lists her monthly expenditures as $1,906.00. Def. Ex. G

### Debtor's Educational Loan History

Murphy received her Bachelor of Science in Biochemistry from Virginia Polytechnic Institute in 1992 and attended medical school at Eastern Virginia Medical School ("EVMS") from 1992 until 1994. Compl. ¶ 4. Schedule F of the debtor's bankruptcy petition listed 16 creditors holding unsecured nonpriority claims. Def. Ex. G. All 16 of these debts arose from educational loans used to finance the debtor's undergraduate and medical school education. Prior to trial, Murphy settled her disputes with all but one of the defendants in this case, leaving ECMC as the only remaining debtor. Tr. at 3. When asked by the Court about the settlement arrangements, Murphy testified that:

> [m]y understanding is that there were two other arrangements; that EVMS discharged the loans that were due to them, and that the other lender worked out an arrangement where if I return to work and my income exceeds a certain amount that I then go into repayment and that I am to provide income tax returns on an annual basis for some years to document that.

1. This stipulation provides that: 1) Kayla Murphy, the debtor's daughter, has a significant medical condition requiring support and ongoing medical care; 2) the debtor is unemployed; 3) the debtor is extensively involved in the care and treatment of her daughter; and 4) the debtor, as of January 13, 2004, was indebted to Educational Credit Management Corporation ("ECMC") for a total of $57,819.16. Stipulation of Facts ¶ 1–4.

2. Prior to trial, counsel for Murphy filed various exhibits with the Court, which were withdrawn by counsel after objection counsel for ECMC. Tr. at 5. Counsel for ECMC presented 7 exhibits, which were not objected to and were deemed admitted. Tr. at 6. Defense exhibit A is the application and promissory note for $4,000.00, dated December 13, 1991. Defense exhibit B is a promissory note for $7,500.00 dated May 23, 1992. Defense exhibit C is a promissory note for $4,000.00 dated May 23, 1992. Defense exhibit D is an indemnification agreement for the assignment of guaranteed student loans with damaged or lost promissory notes. Defense exhibit E is the loan detail, history and balance for Jennifer L.L. Murphy as of October 7, 2003. Defense exhibit G is the debtor's current bankruptcy petitions and schedules.

Tr. at 36. Murphy is indebted to ECMC for approximately $58,000.00. Tr. at 7.[3]

Murphy's loan obligations which remain at issue in the instant case consist of five separate loans, all of which are now held by ECMC [4]:

| Loan Number | Distribution Date | Distribution amount | Total owed as of 10/8/2003 | Interest Rate | Type of Loan |
|---|---|---|---|---|---|
| 1 | 12/26/91 | $ 4,000.00 | $ 5,713.67 | 4.37% | Subsidized |
| 2 | 12/20/92 | $ 7,500.00 | $11,331.28 | 4.37% | Subsidized |
| 3 | 12/20/92 | $ 4,000.00 | $ 8,829.72 | 4.20% | Unsubsidized |
| 4 | 8/2/93 | $ 7,500.00 | $10,562.89 | 4.22% | Subsidized |
| 5 | 12/20/93 | $10,000.00 | $20,748.19 | 4.05% | Unsubsidized |

On examination by counsel for ECMC, Murphy indicated that the sole reason for the initiation of her bankruptcy petition was to obtain a discharge of these student loans.[5] Murphy testified on direct examination that she is not on default on her student loans.[6] On cross-examination counsel for ECMC clarified the status of Murphy's student loans, as Murphy testified that she had made no payments on the loans and had obtained various medical forbearances or deferments.[7] At trial,

3. A consent order between Murphy and Eastern Virginia Medical School was entered by this Court on January 9, 2004. This order provides that Murphy's indebtedness to Eastern Virginia Medical School are discharged pursuant to 11 U.S.C. § 523(a)(8)(B). A consent order between Murphy and HELP Services Group, Inc. was entered by this Court on January 13, 2004. This order provides that Murphy's loans held by HELP Services Group are not discharged, but collection efforts on the loans are stayed and interest will cease to accrue. This arrangement will remain in effect until either Kayla Murphy becomes self-supporting, passes away or Murphy's support ceases to be full time. Furthermore, if Murphy's combined gross annual household income exceeds $100,000.00, with at least $20,000.00 directly attributable to Murphy, then the loans will enter repayment. The repayment terms under this settlement agreement are monthly payments of $178.00 per moth for 20 years, with a final payment of $18.48. Murphy is obligated to provide her yearly tax return within 60 days of filing to ensure that the repayment provisions have not been triggered.

4. The scheduled monthly payments on these five loans is not included in the exhibits presented at trial. All of these loans have a variable interest rate, with the interest rates as of October 7, 2003 of between 4.05% and 4.37%. Def. Ex. E.

5.

Q. Now, the only debts that you've listed on your—in your bankruptcy are unsecured debts. Is that correct?

A. If you're referring to the educational debt, yes, sir.

Q. Now, isn't that the only debt you have listed in your bankruptcy?

A. Yes, sir.

Q. You have no other debt?

A. That is correct, sir.

Q. So, the only reason you filed bankruptcy was to address the dischargeability of student loans?

A. Yes, sir.

Tr. at 20.

6.

Q. You were not in a default status with your loans when you filed bankruptcy. Is that correct?

A. That's correct, sir.

Q. And you had always attempted to find a way to pay those loans back. Is that correct?

A. Every effort was made to work with the agencies that had made the loans, sir.

Tr. at 12.

7.

Q. How much have you paid on these student loans?

counsel for ECMC asked the debtor whether she had contemplated options to facilitate the repayment of her debt. Murphy testified she had considered the William D. Ford Loan Consolidation Program, but had elected not to pursue it because "the amount of repayment, even after consolidation, was excessive with regard to what [Mr. Murphy's] income would allow." Tr. at 20, 21.

Murphy further testified that she did not believe that consolidation of her student loans under the William D. Ford Loan Consolidation Program would enable her to repay her student loans and that she had elected not to consolidate her student loans. *Id.* Murphy indicated that she did not believe that the payment of $296.11 per month that would be required if her loans were consolidated would be feasible given the economic situation of her household, since the Murphys

> have had expenses that are not considered routine monthly expenses, such as car repairs that have not figured into our regular budget, expenses associated with my husband's reduced working hours when he was forced to alter his work schedule rather than be laid off, those types of expenses that are handled by our savings, provided the amount is there.

Tr. at 21. On re-direct, Murphy's counsel inquired further into her understanding of the repayment options available, as Murphy testified she believed that under the Ford Program her loan payments would ultimately increase to $592.21 monthly, which would exceed any projections of monies available to Murphy. Tr. at 27.[8]

### Financial Situation of the Debtor

Murphy last worked full-time from June—August 1991 as a laboratory intern at Virginia Polytechnic Institute. Compl. ¶ 5. Murphy testified that she was unable to complete her education or work outside the home and is therefore unable to repay her student loans. Tr. at 7–8. Murphy also testified at trial that her inability to work is due to the birth of her daughter, Kayla Murphy on August 4, 1995. Tr. at 7–8. Kayla Murphy was born with Pfeiffer Syndrome, which the debtor claims significantly affects her ability to earn an income and repay her student loans.

A. To my knowledge, nothing, sir.
Q. You haven't made on payment?
A. I do not believe so.
Q. Now, you testified earlier that you attempted to find a way to pay it back, these student loans. What does that mean?
A. I have worked wit the educational agencies to use the channels that were in place, the options that were given me. First there was forbearance— I'm sorry. First there was a medical deferment period, and then there was a forbearance period. We exercised those options and provided all the paperwork necessary. During the early years of my daughter's life I was not sure whether or not I would be able to return.
Tr. at 24–25.

8.

> Q. Mr. Gelber asked you about the Ford Direct Loan Repayment Program.
> A. Yes.
> Q. And under the graduated repayment program he talks about over 300 months that you could pay approximately $296.11 a month. Is that correct?
> A. Yes, sir, he stated that.
> Q. But your understanding is the payments would increase throughout that?
> A. Yes, sir, up to 1.5 times the standard allowable.
> Q. Which is $592.21 a month?
> A. Yes, sir.
> Q. Which would really exceed any projections you have of any income of money?
> A. Yes, sir.

Compl. ¶ 7. Murphy is the primary caregiver for her daughter, assisting Kayla Murphy with basic needs such as feeding, catheterization, stooling, monitoring respiratory status, caring for a tracheostomy, providing transportation and coordinating medical care. Tr. at 10–11.

Murphy testified that her husband, Calvin Murphy ("Mr. Murphy") is also able to care for her daughter and that a Medicaid technology waiver reimburses in-home nursing care, which usually includes five eight-hour day shifts and five eight-hour night shifts each week. Tr. at 11.[9] This nursing care must be scheduled two to four weeks in advance, impairing Murphy's ability to work. Tr. at 10. Murphy further testified that despite the sixteen hours of nursing care that is provided via the Medicaid technology waiver, she is unable to work outside the home. The debtor indicated that she must be available in the event a nurse is ill, unavailable or does not appear to give Kayla Murphy necessary care and that the nurses are not legally transport Kayla Murphy, therefore requiring the debtor's legal presence at all times. Tr. at 22.

Murphy testified that she worked for Wal–Mart for a brief time after the birth of her daughter, but was unable to continue working due to scheduling difficulties. Tr. at 10. Murphy additionally testified that she had not considered employment opportunities which would allow her to work at home and has not investigated other care alternatives for her daughter. Tr. at 23.

Mr. Murphy is the sole provider for the household and Murphy testified that she contributes no financial support to the household and has no resources to contribute towards the repayment of her student loans. Tr. at 11–13. Murphy further stated that the continuing obligation to repay her student loans is a hardship on her and her family and that her daughter's condition is highly likely to continue, with only the death of her daughter as possibly alleviating her necessity of care. Tr. at 14–15.

Mr. Murphy is a computer programmer and has been employed at BMH since December 1, 2003. Tr. at 16. Mr. Murphy's annual salary at BMH is $82,000.00. Prior to his employment at BMH, Mr. Murphy was a computer programmer for Net Decisions JAVA Business Solutions for four to five years. Mr. Murphy earned $84,000.00 in 2001 and $83,500.00 in 2002. Murphy testified that since beginning his new job in December, 2003, her husband has not received a regular pay stub and that she did not have the information regarding the two paychecks he had received during the first month and a half of his new employment. Tr. at 29. Murphy further testified that she believes her husband at his previous job had a voluntary withholding for a retirement balance with a balance of $1,000.00, Tr. at 30, and that her husband had a voluntary 1% contribution to his retirement fund at his new employer. Tr. at 40. Murphy testified that she believes that her husband's income will continue at its existing level and possibly increase in future years. Tr. at 16. When questioned by the Court, Murphy testified that after withholdings, Mr. Murphy's net income from his former employer was $2,450 every two weeks. Tr. at 28–29. His present net monthly income,

---

9. As Murphy did not schedule nor testify to any out-of-pocket expenses relating to this Medicaid provided healthcare, it would appear this care is provided without expense to Murphy or Mr. Murphy.

while not precisely known to Murphy, was believed to be comparable. Tr. at 40.

On cross-examination, counsel for ECMC questioned Murphy on the household expenses listed in the bankruptcy petition and her discovery responses. Murphy stated her scheduled monthly expenses for private education of her children was not accurate, as her son had been withdrawn when her husband was briefly unemployed in 2003, reducing her private school tuition monthly expense from $1,014.00 to $507.00. Tr. at 17. Murphy also listed monthly expenses of $128.00 for therapeutic horseback riding for her daughter, $135.00 for recreation, $363.00 for insurance, $300.00 for her car payment and $160.00 for car operation and maintenance. Tr. at 17–19.[10]

When asked on cross-examination about net disposable income, Murphy indicated that her family has "approximately $400 a month." Tr. at 17. Murphy indicated that

this net disposable income was not available to repay her student loans "[b]ecause my husband and I have a savings account in the event he is laid off, and at this point we do not have enough to cover two weeks of his salary without pay." Tr. at 17. The debtor and her spouse currently have approximately $2,500.00 in a savings account. Tr. at 21.[11]

Following the cross-examination of Murphy, the Court questioned he discrepancy between Mr. Murphy's income of $4,900.00 per month and monthly household expenditures of $1,906.00 per month reflected in Schedule J of Murphy's bankruptcy petition.[12] Murphy indicated that the $1,906.00 in expenses listed on Schedule J was the total amount paid for household maintenance every two weeks, rather than every month as claimed in Schedule J. Tr. at 31. When further questioned by the Court, Murphy delineated her monthly expenses in greater detail.[13]

10. Murphy testified the automobile used by Mr. Murphy has been paid for in full.

11. Based upon her estimate that Mr. Murphy receives in net compensation approximately $2,450.00 every two weeks, Murphy has achieved their stated goal of saving an amount equal to at least two weeks pay for her husband.

12.

Court: Well, there's quite a discrepancy there between—if you're telling me correctly your husband nets—at least most recently has netted $4900 per month, and if you correctly and truthfully indicated in your schedules that your expenses were $1906 per month, that leaves a difference, obviously, of over $2,000 per month, yet you have testified that you only have $400 per month left after paying your expenses, so I have to confess I'm very confused as to what the household expenses and income are.

Murphy: Pardon me, sir. I know that when I write my husband's bills out each month I do not—I cannot say that $1900 is per month. I believe it's every two weeks, sir.

Court: But you indicated in your schedules it was every month, did you not?

Murphy: Sir, I would have to look at the papers.

Court: Well, tell me what you pay—if your husband is netting approximately $4900 per month, can you tell me what your expenses are that reduces it to the $400 per month that you have testified to?

Murphy: Are you referring to an outline of my monthly expenses?

Court: Well, I though that was what you had done in your schedules, and of course you recall that was the statement you made under oath, but you seem to be suggesting that that may not be correct because, again, based on your schedules and what you've testified to today is your husband's income, you have a substantial amount of money left over per month, but you've testified that there's only $400 that you feel like you need to devote to savings. And I'm confused, so can you clarify?

Tr. at 32.

13.

Murphy: I spend—I write all of my husband's bill out as the household. The mortgage

The lack of documentation regarding Mr. Murphy's net salary and the family expenses makes the task of determining the true income and expenses of the Murphy household very difficult. The only definite figure presented to this Court is that Mr. Murphy has a base salary of $82,000.00 per year. Without actual documentation as to what his net salary now is, we are left only with Murphy's testimony that at his prior employer, Mr. Murphy's pay was $4,900.00 per month. Tr. at 28–29. Due to the dearth of more accurate information, this Court will base its calculation on this testimony, and will assume that Mr. Murphy is paid 24 times per year.[14] Based on the information provided on the debtor's bankruptcy schedules and

each month is $891 for the first mortgage; it's approximately $25 for the second mortgage.

Utilities run between—for electric, approximately $125 a month; for gas, depending on the season, it can be anywhere from $40 to about $80 per months. The phone bill is $40 a month for local.

The loan on our automobile—the minimum payment is—I believe it's $291. We've been paying $400 a month on that for—since the initiation of the loan.

Court: Well, let me stop you there. I'm not familiar, typically, with auto loans having a minimum payment. Are you saying that you're paying more than what the loan amount is in an effort to repay it quicker? Is that what you're telling me, or are you telling me something else?

Murphy: Prior to my husband having his hours reduced we were making a payment of $400 a month. That is what we had budgeted for the car.

Court: But the loan payment is $291 per month. Is that correct?

Murphy: When we—

Court: Let me finish my question

Murphy: Sorry

Court: Are you, in essence, paying approximately an extra hundred dollars a month in an effort to repay the vehicle more quickly?

Murphy: My husband asked me to pay extra on the loan so as to reduce the price of the car because it is based on how much interest accrues. If the loan is paid off sooner, the car is less expensive.

Court: All right. So, you're paying more than the loan payment in an effort to more quickly repay the loan to hopefully save you an interest expense in the long-run, correct?

Murphy: Yes, sir.

Court: All right. What other monthly expenses do you have?

Murphy: Food, groceries, expenses that are related to my daughter's augmented feedings. Those would probably run in the neighborhood of $650 to $700 a month. At this point we have expenses related to the maintenance of the car. Although we don't usually have maintenance done monthly, it amounts to between, I would say, about $150 a month when you divide it out over a year as to the types of repairs and maintenance that are done for the car.

During the past six months there's been additional expense related to—we purchases a generator for the hurricane because we were told that she wouldn't be allowed to come into the hospital. My husband also had to purchase new clothing for work when he was rehired at a different company.

Tr. at 31–34.

When questioned if there were further household expenses, the debtor testified:

Murphy: Sir, we provide—we have monthly expenses related to the bug man, the pest control for the home.

Court: Do you know approximately how much that is?

Murphy: Approximately, $32 a month. Then there's also a water bill that's about $85 to $90 every other month, a sewage bill that's about $30 every other month, the storm waste management I think is about $20 every six months, the taxes on the automobiles, the AAA, which is $70 annually.

Tr. at 35.

14. Since Murphy's base salary is now $2,000.00 more than at his immediate prior employer, his net monthly salary should actually be greater than $4,900.00. Additionally, if Mr. Murphy is paid bi-weekly, then he would actually be paid 26 times a year.

Murphy's testimony at trial, there are at least five different amounts that may reflect the debtor's actual disposable net income.

*Debtor's Testimony of Disposable Income*

If this Court were to accept the testimony of Murphy at trial without further examination, it would appear that the debtor's family has at least $400.00 per month in disposable income. However, Murphy indicated that this net disposable income was not available to repay her student loans "[b]ecause my husband and I have a savings account in the event he is laid off, and at this point we do not have enough to cover two weeks of his salary without pay." Tr. at 17. Murphy and Mr. Murphy currently have approximately $2,500.00 in a savings account. Tr. at 21.

*Murphy's Testimony Plus Additional Available Funds*

Murphy's testimony indicates that there is more than $400.00 available per month if non-necessary items are removed from the family budget. This increase in available income would result from the elimination of $507.00 which was previously paid to Courthouse Montessori School for her son's private school tuition and the $109.00 per month in excess of the monthly payment that is paid on the debtor's vehicle loan. Murphy testified that there was no obstacle to her son's attendance at public school starting next year, when he is eligible for half days. Tr. at 39. Furthermore, Murphy testified that Jacob Murphy has not attended Courthouse Montessori School since September. Tr. at 17. Therefore, it is logical to presume that

there is an additional $507.00 per month that is available to the Murphy from the savings in private school tuition plus the extra $109.00 per month that is paid on the automobile would be available for student loan payments. Therefore, if the additional expenses that are not necessary or have already been eliminated from the household expenses are added to the available $400.00 per month, the debtor's disposable net income would increase to $1,016.00 per month.

*Bankruptcy Schedules*

If Murphy's bankruptcy schedules, which were signed under oath are correct, and the total household expenses are $1,906.00 per month, Murphy and her family have a disposable net income of $2,994.00 per month after the payment of all scheduled expenses.

If Murphy listed the household expenses on a bimonthly basis, as Murphy indicated during her testimony, instead of on a monthly basis as required on Schedule J, then the total monthly expenses would be $3,812.00. Tr. at 31–32. Thus, after doubling her scheduled expenses, there is a disposable net income of $1,088.00 per month.

*Murphy's Testimony as to Monthly Expenses*

A fifth method of calculating Murphy's disposable net income available for student loan repayment is by utilizing Murphy's more specific testimony at trial when examined by the Court regarding her family's actual expenses. Murphy testified as to the following expenses [15]:

---

**15.** When examined by the Court, Murphy detailed the expenses listed beginning with the first mortgage through the expense for insect control. The expenses for her daughter's private school tuition, recreation, sports fee and insurance were earlier testified to by Murphy, and while not mentioned by Murphy when examined by the Court, these expenses have also been added to those separately delineated by Murphy.

| | |
|---|---|
| First Mortgage | $ 891.00 |
| Second Mortgage | $ 25.00 |
| Utilities | $ 125.00 |
| Gas | $ 80.00 |
| Phone | $ 40.00 |
| Car Payment | $ 291.00 |
| Groceries | $ 700.00 |
| Car Repairs | $ 150.00 |
| Water | $ 45.00 |
| Sewer | $ 15.00 |
| Storm water Management Fee | $ 5.00 |
| AAA | $ 5.83 |
| Insect Control | $ 34.00 |
| Tuition for Daughter | $ 507.00 |
| Recreation | $ 135.00 |
| Sports fee | $ 128.00 |
| Insurance | $ 363.00 |
| Total | $3,539.83 |

Tr. at 32–35.

These specific expenses, when deducted from her net family income, produce a monthly surplus of $1,360.17 available for student loan repayment.

Based on all the testimony and exhibits, the range of monies remaining monthly for Murphy and her family is between $400.00 and $2,944.00. The Court acknowledges it is perhaps unlikely that the Murphys actually have available for savings each month as much as $2,944.00. However, the measure is not how much money is remaining monthly, but instead the monies necessary to be expended in order for Murphy and her family to maintain a "minimal" lifestyle. The imprecision of Murphy's testimony makes this difficult. When required to itemize her family's monthly expenses, Murphy listed $2406.83 in expenses. This itemization includes such non-monthly expenses as AAA automobile hazard coverage, water, sewer and wastewater disposal fees, suggesting to the Court this itemization was highly inclusive. In addition to this extensive list of monthly expenses, Murphy separately testified to a number of significant expenses, such as private school tuition, therapeutic recreation and sports fees and insurance. Even without consideration as to the necessity of these addi-

tional expenses for a "minimal" lifestyle, the maximum expenses which can be attributed to Murphy and her family is $3,539.83 each month, leaving a monthly net family income surplus of $1,360.17 when subtracted from her monthly net family income. This picture of family finances is the most complete which can be constructed from Murphy's often vague and fragmentary testimony and this Court finds Murphy has available monthly the sum of $1,360.17 to repay her remaining student loans.

## CONCLUSIONS OF LAW

### Undue Hardship

Student loans generally are non-dischargeable debts and pass through the bankruptcy process unaffected. *Ekenasi v. Education Resources Inst.,* 325 F.3d 541, 545 (4th Cir.2003)(*citing Kielisch v. Educational Credit Mgmt. Corp. (In re Kielisch),* 258 F.3d 315, 320 (4th Cir.2001)). Congress has provided that government-guaranteed student loans are nondischargeable in bankruptcy unless the debtor can demonstrate that the repayment of such student loans would constitute an "undue hardship." 11 U.S.C. § 523(a)(8) (West Supp.2003). This exception from discharge of student loans "was enacted to prevent indebted students or graduate students from filing for bankruptcy immediately upon graduation, thereby absolving themselves of the obligation to repay their student loans." *In re Kielisch,* 258 F.3d at 320 (*quoting Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby),* 144 F.3d 433, 436–37 (6th Cir.1998)). Section 523(a)(8) of the Bankruptcy Code provides:

A discharge under Section 727...of this title does not discharge an individual debtor from any debt–

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or non-profit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C § 523(a)(8) (West Supp.2003).

■ The term "undue hardship" is undefined in the Bankruptcy Code. The Fourth Circuit Court of Appeals has adopted the three-part test articulated in the decision of *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2nd Cir.1987). *In re Ekenasi*, 325 F.3d at 546.[16] Thus, in order to discharge a government-guaranteed student loan, a debtor "must establish (1) that he cannot maintain a minimal standard of living for himself and his dependents, based on his current income and expenses, if he is required to repay the student loans; (2) that additional circumstances indicate that his inability to do so is likely to exist for a significant portion of the repayment period of the student loans; and (3) that he has made good faith efforts to repay the loans." *In re Ekenasi*, 325 F.3d at 546 (*quoting Brunner*, 831 F.2d at 396).

■ A determination of the dischargeability of a student loan must be brought by filing an adversary proceeding. *Banks v. Sallie Mae Servicing Corp. (In re Banks)*, 299 F.3d 296, 300 (4th Cir.2002) (*citing* Fed. R. Bankr.P. 7001(6)). The debtor has the burden to prove by a preponderance of the evidence that repayment of the student loans would constitute an undue hardship. *Jones v. Nat'l. Payment Center (In re Jones)*, 246 B.R. 821, 823 (Bankr.E.D.Va.2000); *U.S. Dept. of Educ. v. Blair (In re Blair)*, 301 B.R. 181, 184 (Bankr.D.Md.2003) (*citing Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

■■ Generally speaking, the legislative history of Section 523(a)(8) suggests a finding of undue hardship is an exception to the rule and it must mean more than unpleasantness associated with repayment of a just debt. *In re Jones*, 242 B.R. 321, 325 (Bankr.E.D.Va.1998). Each undue hardship discharge must rest on its own facts, but dischargeability of student loans should be based on a "certainty of hopelessness." *Id.* (quoting *Lezer v. New York State Higher Educ. Services Corp. (In re Lezer)*, 21 B.R. 783, 789 (Bankr.N.D.N.Y. 1982)). In order to discharge a student loan, a debtor must show that unique or extraordinary circumstances which created the hardship render it unlikely that the debtor will ever be able to honor her obligations. *Id.* (*citing Love v. U.S. (In re*

**16.** Prior to *In Re Ekenasi,* a number of courts within the Fourth Circuit Court of Appeals had utilized the *Brunner* factors to analyze whether the repayment of a student loan constituted an undue hardship under Section 523(a)(8) of the Bankruptcy Code. *See Wilson v. Educational Credit Mgmt. Corp. (In re Wilson),* 2002 WL 32155401 at *3 (Bankr.E.D.Va. 2002); *Tennessee Student Assistance Corp. v. Mort (In re Mort),* 272 B.R. 181, 183 (W.D.Va. 2002); *McCormack v. Educational Credit*

*Mgmt. Corp. (In re McCormack),* 2000 WL 33710278 at *4 (Bankr.D.S.C.2000); *Vermont Student Assistance Corp. v. Coulson (In re Coulson),* 253 B.R. 174, 177 (W.D.N.C.2000); *Commonwealth of Virginia Educ. Assistance Authority v. Dillon (In re Dillon),* 189 B.R. 382, 384 (W.D.Va.1995); *Ammirati v. Nellie Mae, Inc.,* 187 B.R. 902, 905 (D.S.C.1995); *Walcott v. USA Funds, Inc. (In re Walcott),* 185 B.R. 721, 724 (Bankr.E.D.N.C.1995).

*Love),* 33 B.R. 753, 754–5 (Bankr.E.D.Va. 1983)).

It remains then to assess the evidence adduced at trial to determine if Murphy has proven that repayment of the student loans owed to ECMC will constitute an undue hardship.

## I

### Maintenance Of A Minimal Standard Of Living

 The initial prong of the *Brunner* inquiry requires this Court to assess whether the debtor has proven she cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the student loans. *In re Ekenasi,* 325 F.3d at 546 (citing *Brunner,* 831 F.2d at 396). In making this assessment, a court should examine a debtor's standard of living with a view toward ascertaining whether the debtor has attempted to minimize the expenses of himself and his dependents. *U.S. Dep't. of Health & Human Services v. Smitley (In re Smitley),* 347 F.3d 109, 117 (4th Cir.2003) (citing *Rice v. U.S. (In re Rice),* 78 F.3d 1144, 1149 (6th Cir.1996)) and *In re Ekenasi,* 325 F.3d at 546. In contemplation of what constitutes a "minimal standard of living," some courts have equated poverty with such a standard. *McCormack v. Educational Credit Mgmt. Corp. (In re McCormack),* 2000 WL 33710278 at *4 (Bankr.D.S.C.2000) (citing *In re Griffin,* 197 B.R. 144, 147 (Bankr.E.D.Okla.1996)). Other courts have not required that debtors live in poverty in order to satisfy the first *Brunner* prong, instead taking into consideration the debtor's current income and expenses in determining whether the debtor and his or her dependents, if any, will be able to sustain a "minimal" stan-

dard of living. *In re McCormack, id.* (citing *Ammirati v. Nellie Mae, Inc. (In re Ammirati),* 187 B.R. 902, 907 (D.S.C. 1995)), *aff'd.* 85 F.3d 615. Specifically, the bankruptcy court must determine what amount is minimally necessary to ensure that the debtor's needs for care, including food, shelter, clothing and medical treatment are met. *Salinas v. United Student Aid Funds, Inc. (In re Salinas),* 240 B.R. 305, 314 (Bankr.W.D.Wis.1999). Once that determination is made, the question is whether the debtor has additional funds with which to make payments toward his or her student loans. *Id.*

### Family Income

 In assessing the first *Brunner* prong under the evidence adduced here, an initial inquiry surfaces. Murphy is not presently employed outside of her home and in her bankruptcy schedules has listed no monthly income but has scheduled $1906.00 each month in living expenses. She testified at trial that her husband earns $82,000.00 annually in his current position of employment and apparently Mr. Murphy supplies all of the monetary consideration for the payment of the living expenses of Murphy and their two children. Murphy urges this Court that it should not contemplate Mr. Murphy's substantial income in its consideration of whether the debtor can maintain a "minimal" standard of living if she is required to repay the student loans remaining for which she seeks a hardship discharge.

Courts within the jurisdiction of the Fourth Circuit Court of Appeals that have considered this question have concluded that family income must be the measure of the income calculation commanded by the first *Brunner* prong. *Educational Credit Mgmt. Corp. v. Buchanan (In re Buchanan),* 276 B.R. 744, 751 (N.D.W.Va.2002)

(citing *White v. U.S. Dept. of Educ. (In re White)*, 243 B.R. 498, 509 (Bankr.N.D.Ala. 1999)); *State Educ. Assistance Authority v. Dillon (In re Dillon)*, 189 B.R. 382, 385 (W.D.Va.1995). "In fact, the vast majority of reported decisions in which the dischargeability of a student loan debt owed by a married debtor was at issue the courts have considered the earnings of both the debtor and his or her spouse for the purpose of evaluating the quality of the debtor's lifestyle."[17] *In re White*, 243 B.R. at 509. *See also Sweeney v. Educational Credit Mgmt. Corp. (In re Sweeney)*, 304 B.R. 360, 362–63 (D.Neb.2002) ("[o]verwhelming authority requires that a court consider the spouse's income. This court finds no published opinion of a court that holds to the contrary").

The reasoning for inclusion of a non-debtor spouse's income in measuring the lifestyle of the debtor spouse was aptly explained by Judge Cohen:

> The debtor...argues that the Court should not consider [the non-debtor spouse's] income because the Court should consider only the potential lifestyle that could exist for a debtor if the debtor's spouse chooses not to support the debtor or if the couple separates or divorces, not the couples' current actual lifestyle. The Court must disagree.
>
> Couples not only provide financial support to one another but each partner has a legal obligation, enforceable between them, to support one another to the extent of individual capabilities.
>
> . . . . .
>
> In the bankruptcy context, section 523, by its terms, plainly considers the impact of the exception of a student loan

debt from discharge on both the debtor *and his or her dependents*. A family member can be a dependent of, or a provider for, the debtor. Either way, the family member's very existence impacts the quality of the debtor's lifestyle, maybe adversely, maybe favorably.

*Id.* at 510. Even the circumstance here where Murphy is not employed outside the home and her husband supplies the entirety of the family income does not negate this rationale. *See Mitchell v. U.S. Dep't. of Educ.*, 210 B.R. 105, 108 (Bankr. N.D.Ohio 1996) (where debtor had no income and her husband earned $45,000.00 annually, debtor failed to show undue hardship). Furthermore, consideration of a non-debtor spouse's income is not uncommon in a number of other bankruptcy contexts, including determination under 11 U.S.C. § 523(a)(15)(A) of whether the benefit to a debtor of discharging a non-support obligation arising from a divorce outweighs the detriment such a discharge would have on the debtor's former spouse. *Ferraro v. Ballard*, 2001 WL 1946239 at *19 (Bankr.E.D.Va.2001), *aff'd.*, 69 Fed. Appx. 145 (4th Cir.2003) (*per curiam*), and in determination of whether or not a debtor is devoting all of his or her disposable income to the fulfillment of a Chapter 13 plan as required by 11 U.S.C. § 1325(b)(1)(B). *In re White*, 243 B.R. at 511 (citing numerous cases).

Finally, some debtors have argued that even if a non-debtor's income is considered in the context of the initial *Brunner* prong, it should be considered only to the extent of the non-debtor spouse's agreed share of the combined family living expenses. If not so considered, this argu-

**17.** *See In re White*, 243 B.R. at 509, for an exhaustive list of some forty-nine (49) supporting decisions.

ment continues, the non-debtor spouse will, in effect, be forced to help pay the debtor's student loans by being required to pay more than his or her fair share of the living expenses, while that portion of the debtor's income which ordinarily would be devoted to the payment of his or her share of the living expenses is diverted to student loan creditors. Here again, the command of *Brunner* to measure the debtor's actual lifestyle nullifies this argument. This Court's measure of a "minimal" lifestyle, therefore, makes not relevant any theoretical calculation of a debtor's "fair share" of their family lifestyle. *Id.* at 512. This Court must review the actual lifestyle and living standard of Murphy to fairly conclude whether the first prong of *Brunner* has been proven.[18]

A review of decisions of the jurisdictions of the Fourth Circuit indicates courts generally do not find an inability to maintain a minimal standard of living where a debtor shows a surplus of income over expenses. *Virginia Educ. Loan Authority v. Archie (In re Archie)*, 7 B.R. 715, 718–9 (Bankr. E.D.Va.1980) (evidence showed a net surplus of $37.13 of income over expenditures even with extraordinary high phone bill and clothing expenses); *In re Dillon*, 189 B.R. at 385 (where debtor testified she

---

18. Some courts have suggested, in a context where debtor and spouse each have income, that consideration of the entirety of the non-debtor spouse's income in the measure of the first *Brunner* prong is inappropriate. *See Innes v. Kansas (In re Innes)*, 284 B.R. 496, 508 (D.Kan.2002) (bankruptcy court correctly considered all of non-debtor spouse's income and applied the proportionate share of her income to the family's essential living expenses for "[t]o require her to do more would essentially force [the non-debtor spouse] or her children to pay debts for which she is not liable and support [the debtor] while being denied the right to apply some of her income to reasonably non-luxury items.") The specific circumstances which motivated these courts seem to not be in evidence here. It is doubtless that inclusion of Mr. Murphy's substantial income in consideration of the measure of Murphy's lifestyle under the first *Brunner* prong may have the practical effect of requiring Mr. Murphy to fund the repayment of student loans for which he is not liable to repay. However, *Brunner* teaches that the measure is a minimal standard of living. Here the Murphys have concluded their needs and the needs of their children are best met by electing to have Murphy supply the bulk of the childcare while Mr. Murphy is employed outside the home. It is doubtless this decision is grounded in the consideration of the special needs of their daughter; nonetheless it appears fundamentally unfair to theoretically assume Murphy has no income yet has the substantial monthly living expenses scheduled by her.

Ultimately, this court believes consideration of the first prong of *Brunner* logically requires assessment of the debtor's actual lifestyle and especially so where a debtor, whether compelled by considerations of her dependents or by motives less noble, has elected to forgo any employment and rely on her spouse to fund all the material needs of the family. If a debtor is able to forgo outside employment and income and devote his or her full energies to child rearing, not to consider her spouse's income in calculation of whether the student loans may be repaid while maintaining a minimal lifestyle appears to be as artificial and inappropriate as assuming a family does not function as a combined economic unit. The factual circumstances here are markedly different than the consideration of how to apportion expenses between two spouses employed outside the home and this Court must consider the lifestyle of Murphy and whether there is money available after maintenance of a minimal lifestyle to repay the remaining student loan, regardless of the source of the income which funds this lifestyle. Parenthetically, it appears decisions like *Innes* which distinguish the reasoning of *White* are at least in part motivated by factual circumstances where, despite any manner of permutations of income inclusion or expense allocation, the debtor's family expenses substantially exceed the family income. *In re Innes*, 284 B.R. at 500, 508.

could pay $50–$75 each month on $2000.00 student loan there was no undue hardship); *In re Love,* 33 B.R. at 754 (no undue hardship where $30.00 per month surplus of income over expenses). *But see Floyd v. Educational Credit Mgmt. Corp.,* 2002 WL 31839159 (4th Cir.2002) (table) (no error when bankruptcy court found debtor with $100.00 in monthly disposable income was entitled to partial discharge of student loan).

In contrast, many of the decisions of the jurisdictions of the Fourth Circuit have permitted a discharge of student loans where there was a substantial deficiency of income to expenses for a debtor. *See, e.g., Reilly,* 118 B.R. at 41 (discharge permitted where $600.00 a month deficiency of income to expenses); *In re Wilson,* 2002 WL 32155401 at *3 (discharge permitted where debtor had monthly expenses of $1829.03 and income of $1578.99); *Vermont Student Assistance Corp. v. Coulson (In re Coulson),* 253 B.R. 174, 178 (W.D.N.C.2000) (first *Brunner* prong met where "debtor's expenses clearly exceed her income, even though debtor has done almost everything possible to maximize her income and minimize her expenses"); *Ammirati v. Nellie Mae, Inc. (In re Ammirati),* 187 B.R. 902, 907 (D.S.C.1995) (no error where bankruptcy court "found the debtor's current income is $3,800.00 [monthly] with expenses of $4,350.00 and that, with the exception of selling his house, debtor had done everything possible to minimize expenses and maximize income"); *In re McCormack,* 2000 WL 33710278 at *5 (partial discharge permitted where debtor's monthly expenses were $2,446.48 and income was $2,078). While it is certain that a proper analysis of whether the debtor may maintain a minimal standard of living

and repay the student loans entails many considerations other than the existence or not of a deficiency of monthly income to expenses, nonetheless these decisions provide insight into the living circumstances which compel a court to find satisfaction or not of the initial *Brunner* prong.

■ A review of the evidence in the instant matter shows Murphy to have failed to carry her burden in proving she will be unable to maintain a minimal standard of living if required to repay the remaining student loans.

As detailed earlier, Murphy has family income available of approximately $1,360.00 for the payment of her student loans after payment of her family living expenses. This amount available for student loan repayment is arrived at without any challenge of the necessity or reasonableness of any of Murphy's testified to expenses, including the private school tuition and therapeutic riding expenses for her daughter and the recreational expenses of the family. This net availability of monies is also available without challenging Murphy's assumption she is unable to work at all, either outside the home or at home, despite the availability of sixteen hours daily of skilled nursing assistance for her daughter without expense to Murphy. Taking as reasonable and necessary all of Murphy's specified expenses, and without consideration of whether Murphy's declination of any working opportunities inside or outside the home or part-time is mandated in perpetuity by her daughter's condition, Murphy still has substantial monthly income available to repay her remaining student loans. This is particularly so if Murphy would avail herself of the available benefits of the William D. Ford Program.[19] For these reasons, Murphy

---

**19.** Even if Murphy is correct that her payment under the income contingent option of

the William D. Ford Program would ultimately escalate to $592.21 per month, Tr. at 27,

has failed to prove she is unable to repay her remaining student loans owed to ECMC and maintain a minimal standard of living for herself and her dependents.

## II

### Additional Circumstances

■ The second *Brunner* prong requires a student loan debtor to establish that additional circumstances indicate a debtor's inability to maintain a minimal standard of living for herself and her dependents if required to repay the student loans is likely to exist for a significant portion of the repayment period of the student loans. *In re Ekenasi*, 325 F.3d at 546 (citing *Brunner*, 831 F.2d at 396). Undue hardship is not based on a present inability to pay but rather upon a "certainty of hopelessness that future payments cannot be made." *Wilson v. Educational Credit Mgmt. Corp.*, 2002 WL 32155401 at *3 (Bankr.E.D.Va.2002) (citing *In re Love*, 33 B.R. at 755).

Here Murphy has testified that her daughter's disability is permanent and she will require a high level of care indefinitely. Tr. at 14, 15. While the Court accepts that Murphy's daughter is permanently disabled, and that her current medical condition is likely to persist indefinitely, this provides an evidentiary answer to a question other than the inquiry posed by the second *Brunner* prong.

■ The second *Brunner* inquiry commands that this Court first find an inability to pay the student loans while maintaining a minimal standard of living, and

then an assessment of whether additional circumstances make it likely this inability to pay will persist for the life of the loans. Here for the reasons set forth in Part I, this Court has concluded Murphy has failed to establish she is unable to pay the student loan remaining and maintain a minimal standard of living. Accordingly, it is axiomatic that, having failed the first *Brunner* prong, Murphy cannot satisfy the second prong. *See Reindl v. Educational Credit Mgmt. Corp. (In re Reindl)*, 2002 WL 32150420 at *3 (W.D.Wis.2002) ("If, as I have found, the plaintiffs cannot show that they would be unable to maintain a minimal standard of living if forced to pay their loans at this time, it is implausible that they can meet this second factor [of *Brunner*]"). Furthermore, the sole evidence at trial indicates that Murphy's annual family income has been consistently at least $80,000.00 since 2001 and the salary of Mr. Murphy is expected to continue and hopefully increase. Tr. at 16.[20] Having not demonstrated any inability to repay her student loans and maintain a minimal standard of living, and in fact conceding her family income of in excess of $80,000.00 annually is expected to continue, the Court must conclude there is a failure to establish the second *Brunner* prong.

## III

### Good Faith Effort to Repay

■ The third prong of the *Brunner* test requires a court to measure whether a debtor has made a good faith

this future payment would consume about one-half of the surplus available monthly, assuming Mr. Murphy's income never increases.

**20.** Murphy was asked under cross-examination the following:

Q. "So, his [Mr. Murphy's] salary is expected to continue and hopefully increase?" A. "Yes, sir."

effort to repay the outstanding student loans. This final factor recognizes that "[w]ith the receipt of a government guaranteed education, the student assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income, and minimize expenses." *Goulet v. Educational Credit Mgmt. Corp.*, 284 F.3d 773, 779 (7th Cir.2002)(*quoting In the Matter of Roberson*, 999 F.2d 1132, 1136 (7th Cir.1993)). This encompasses the notion that a "debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'" *Elebrashy v. Student Loan Corp.*, 189 B.R. 922, 928 (Bankr.N.D.Ohio 1995) (*quoting In re Roberson*, 999 F.2d at 1136).

■■■■ In determining whether a debtor has made a good faith effort to repay a student loan obligation, a primary consideration is whether the debtor actually made any payments on the obligation, and if so, the total amount of payments. *Hall v. U.S. Dep't. of Educ. (In re Hall)*, 293 B.R. 731, 737 (Bankr.N.D.Ohio 2002) (*citing Green v. Sallie Mae Servicing Corp. (In re Green)*, 238 B.R. 727, 736 (Bankr. N.D.Ohio 1999)). Some courts have concluded, however, that a *debtor who fails to make payments on a student loan is not necessarily foreclosed from a finding of a good faith effort to repay*, reasoning that good faith encompasses all relevant factors. *Id.* Where a debtor has made no payments on a student loan obligation,

courts nonetheless have not precluded a finding of good faith where the debtor has no funds to make any repayments. *Elebrashy*, 189 B.R. at 928; *Hawkins v. Buena Vista College (In re Hawkins)*, 187 B.R. 294, 299 (Bankr.N.D.Iowa 1995); *Conner v. Ill. State Scholarship Comm'n (In re Conner)*, 89 B.R. 744, 749 n. 18 (Bankr.N.D.Ill.1988); *Courtney v. Gainer Bank (In re Courtney)*, 79 B.R. 1004, 1011 (Bankr.N.D.Ind.1987).

■■■■ One court has suggested a compendium of considerations in determining whether a debtor has made a good faith effort to repay a student loan:

(1) whether a debtor's failure to repay a student loan obligation is truly from factors beyond the debtor's reasonable control;

(2) whether the debtor has realistically used all their [sic] available financial resources to pay the debt;

(3) whether the debtor is using their best efforts to maximize their [sic] financial potential;

(4) the length of time after the student loan first becomes due that the debtor seeks to discharge the debt;

(5) the percentage of the student loan debt in relation to the debtor's total indebtedness;

(6) whether the debtor obtained any tangible benefit(s) from their student loan obligation.[21]

*In re Hall*, 293 B.R. at 737 (citing *Flores v. U.S. Dep't. of Educ. (In re Flores)*, 282

---

**21.** This Court disagrees that the tangible benefit a debtor obtained from a student loan obligation is properly a factor in the consideration of good faith. It is not appropriate for this Court to consider the "value" of a debtor's chosen education but rather only to assess whether the three prongs of *Brunner* have been satisfied. *See Raymond v. North-*

*west Educ. Loan Assoc. (In re Raymond)*, 169 B.R. 67, 71 (Bankr.W.D.Wash.1994) ("The government is not an insurer of the value of education"); *Silliman v. Nebraska Higher Educ. Loan Program (In re Silliman)*, 144 B.R. 748, 752 (Bankr.N.D.Ohio 1992); *In re Brunner*, 46 B.R. 752, 755 (S.D.N.Y.1985).

B.R. 847, 856 (Bankr.N.D.Ohio 2002)). *See also Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 360 (6th Cir.1994) (Relevant good faith factors are (1) whether the debtor attempts to repay the debt; (2) the length of time after the student loan becomes due that the debtor seeks to discharge the debt; (3) the percentage of the student loan debt in relation to the debtor's total indebtedness and (4) the debtor's attempts to find suitable employment). This Court has noted that a good faith effort also requires "the debtor to have made payments when he or she was in a position to make such payments," and that "[c]ourts have usually refused to discharge student loans where they are the bulk of debtor's debt or when student debt is the first or second largest single type of debt." *In re Wilson*, 2002 WL 32155401 at *4 (*quoting Lohr v. Mae (In re Lohr)*, 252 B.R. 84, 89 (Bankr.E.D.Va.2000)). Some courts have additionally looked to whether a student loan debtor has attempted to negotiate a repayment plan such as the federal government's Income Contingent Repayment Plan as an important indicia of good faith.[22] See *Cota v. U.S. Dep't. of Educ. (In re Cota)*, 298 B.R. 408, 420 (Bankr.D.Ariz.2003) ("The court agrees that the good faith requirement of *Brunner* requires that the court consider [the debtor's] conduct in failing to explore alternatives, such as the ICR. However, the failure to explore such programs, especially if the programs offer no effective relief, is not *per se* an indication of lack of good faith"); *Pennsylvania Higher Educ. Assistance Agency v. Birrane (In re Birrane)*, 287 B.R. 490, 500 (9th Cir. BAP 2002) (quoting *U.S. Dept. of Educ. v. Wallace (In re Wallace)*, 259 B.R. 170, 185 (C.D.Cal.2000)) ("[g]ood faith is also measured by a debtor's effort—or lack thereof—to negotiate a repayment plan"). Even after filing of an adversary to discharge a student loan, "[a] debtor's obligation to make 'good faith' efforts to repay [her] education loans is not extinguished" and where a debtor first learns about the Income Contingent Repayment Programs during the trial of the adversary, a court considers whether any discussions concerning such options takes place. *Id.* Finally, this Court is reminded that the William D. Ford Program is "no silver bullet" and if the creditors fail to advise particular debtors of that or comparable programs and assist the debtors with pursuing them, failure to consider these alternatives does not indicate a lack of good faith. *In re Cota*, 298 B.R. at 421 (quoting *In re Cheney*), 280 B.R. 648, 664 (N.D.Iowa 2002).

A review of recent decisions of the courts of the Fourth Circuit reveals in

---

22. The United States Department of Education offers a number of repayment options for student loans. These plans are the standard repayment plan, extended repayment plan, graduated repayment plan and income contingent repayment plan, each of which is offered under the William D. Ford Federal Direct Loan Program provided for under 34 C.F.R. § 685.208 (2003). Under the Income Contingent Repayment program, the annual amount payable by a borrower is the lesser of (a) the amount the borrower would repay annually over 12 years or (b) 20% of discretionary income. The Department of Education maintains an interactive website which permits borrowers to determine what their payments would be based on the outstanding amount due on a loan and based on the debtor's gross income and family size. The Department of Education also makes available on its website the "Direct Loan Payment Handbook," which provides worksheets which purportedly make it possible for a student loan obligor to determine what his or her payment would be under the four types of programs. *In re Cota*, 298 B.R. at 414 n. 7, 420–21.

most instances where a court determined a debtor made a good faith effort to repay their student loan there was a finding that substantial loan payments had been made. *See, e.g., In re Coulson*, 253 B.R. at 179 (good faith found "where debtor has diligently made payments or sought deferments for seven years" notwithstanding "supporting at least 2 (and initially 4) dependent children by herself"); *In re Lohr*, 252 B.R. at 89 ("the debtor made payments when she was financially able, tried to negotiate deferments and forbearance in lieu of bankruptcy when she was not and filed bankruptcy only as a last resort"); *In re McCormack*, 2000 WL 33710278 at *6 ("[d]ebtor has made over twenty payments on her student loan prior to filing bankruptcy, and she has made various efforts to find a job that would provide more income, but has been unable to find one at the present time"); *In re Wilson*, 2002 WL 32155401 at *4 (debtor consistently made payments on student loans for twelve years and, after loan consolidation, made 29 payments); *Floyd v. Pennsylvania Higher Educ. Assistance Agency*, 54 Fed. Appx. 124, 126 (4th Cir.2002) (table) (where bankruptcy court found the debtor kept in frequent contact with his lenders, arranged for deferrals and forbearance, investigated loan consolidations and workout options and made partial payments for a year, third prong of *Brunner* was satisfied and no error committed). Conversely, where no payments at all have been made by a debtor, courts often have concluded no good faith effort to repay was in evidence. *Tennessee Student Assistance Corp. v. Mort (In re Mort)*, 272 B.R. 181, 185 (W.D.Va.2002) ("[a]lthough her failure to make payments on the loan does not on its own show lack of good faith, the debtor's refusal to minimize her expenses and maximize her income ... preclude a hardship discharge of any portion of the loan"); *Kapinos v. Graduate Loan Center (In re Kapinos)*, 253 B.R. 709, 714 (Bankr. W.D.Va.2000) (no " 'good faith efforts to repay the loans' when [the debtor] has affirmatively established that she made no efforts to make any payments before seeking their discharge"); *In re Weir*, 296 B.R. 710, 718 (Bankr.E.D.Va.2002) (no good faith shown where "[n]ot only has debtor not made any effort to repay any portion of these loans, but she has repeatedly refused various repayment options that have been offered to her"). *But see Reilly v. United Student Aid Funds, Inc.*, 118 B.R. 38, 41–2 (Bankr.D.Md.1990) ("the debtor's demonstrated inability to tender payments on a student loan which became due five years prior to filing of bankruptcy provides an exception to the rule that payments must be made in order to show good faith").

Decisions outside of the jurisdictions of the Fourth Circuit Court of Appeals mirror this same reluctance to find good faith where the debtor has made minimal or no payments on student loans. *See, e.g., Garrett v. New Hampshire Higher Educ. Assistance Foundation (In re Garrett)*, 180 B.R. 358, 364 (Bankr.D.N.H.1995) (no good faith shown where "[t]he record is devoid of any payment made by [the debtor] on these loans or even any attempt to enter into a repayment schedule with [the lenders]"); *Raymond v. Northwest Educ. Loan Ass'n (In re Raymond)*, 169 B.R. 67, 70 (Bankr.W.D.Wash.1994) (no good faith shown where the debtor made no payments on his student loans for at least half the time he was employed); *Silliman v. Nebraska Higher Educ. Loan Program (In re Silliman)*, 144 B.R. 748, 751 (Bankr. N.D.Ohio 1992) (no good faith shown where "[d]ebtor deferred the loan repayment once, but made no payments or even

contacted the creditor in an attempt to reschedule the payments"); *Thoms v. Educational Credit Mgmt. Corp. (In re Thoms)*, 257 B.R. 144, 150 (Bankr.S.D.N.Y. 2001) (good faith not shown where the "[d]ebtor only made seven payments totaling $683.69 from 1991 to 1993 and has made no payments at all since receiving her master's degree"); *Fuller v. U.S. Dep't. of Educ. (In re Fuller)*, 296 B.R. 813, 818 (Bankr.N.D.Cal.2003); ("no good faith shown where debtor made no payments on his Department of Education loans"); *Douglass v. Great Lakes Higher Educ. Servicing Corp. (In re Douglass)*, 237 B.R. 652, 657 (Bankr.N.D.Ohio 1999) (no good faith effort to repay when debtor made no payments on loans that represented 92% of her indebtedness); *In re Mitchell*, 210 B.R. at 109 (no good faith effort to repay when debtor only made $300.00 payment on $8,000.00 student loan debt that was only scheduled debt in the case); *Cobb v. University of Toledo (In re Cobb)*, 188 B.R. 22, 23 (Bankr.N.D.Ohio 1995) (no good faith shown where debtor made only payments on student loans representing over 50% of scheduled debt); *Daugherty v. First Tennessee Bank (In re Daugherty)*, 175 B.R. 953, 959–60 (Bankr. E.D.Tenn.1994) (no good faith effort to repay when debtor made only two payments on student loans amounting to 47% of total unsecured debt); *Ledbetter v. U.S. Dep't. of Educ. (In re Ledbetter)*, 254 B.R. 714, 717 (Bankr.S.D.Ohio 2000) (no good faith "when debtor made only three payments on two student loans that represented the only scheduled debt in [the] case"); *But see In re Elebrashy*, 189 B.R. at 929 ("[g]iven the magnitude of the student loan debt, the paucity of [the debtor's] income, and the apparent hopelessness for future improvement of his situation, the fact he made no payments on his student loans until after he had consulted an experienced bankruptcy attorney is not an indication of bad faith").

■ Murphy has not convinced the Court that she has made a good faith effort to make payments on the remaining ECMC loans. By her admission, Murphy has never made any payments on these student loans. This absence of payments is despite what by any reasonable measure appears to be substantial monthly family income available to make payments on these loans. Murphy solely has negotiated forbearances and deferments of these student loans; no serious, good faith effort to pay any amounts at any time since the inception of these loans has occurred. This is despite the fact that she has enjoyed an annual family income in excess of $80,000.00. Additionally, Murphy does not appear to have given any serious consideration to the options for entry into any of the repayment options under the William D. Ford Program. Here, there is the additional concern as well that 100% of the debt sought to be discharged by Murphy in her Chapter 7 case is in the form of student loans. By her own admission, the sole purpose of Murphy's filing was to relieve herself of her student loans. Murphy has not made any effort to repay any portion of these loans to ECMC, despite what appears to be a substantial monthly income available to do so. As such, given consideration of all the circumstances here, the Court must conclude Murphy has failed to prove she has made a good faith effort to repay her student loans to ECMC.

## SUMMARY

■ It is doubtless that Murphy's burden of caring for her disabled daughter is immeasurable and her disappointment in

her inability to complete her medical education immense. But discharge of a student loan must be founded on more than notions of sympathy or fairness. See *U.S. Dep't. of Educ. v. Blair (In re Blair)*, 301 B.R. 181, 186 (D.Md.2003) ("[t]he failure of [the debtor] to prove undue hardship, as required by § 523(a)(8) for discharge of her student loans, precludes the creative relief [of a payment moratorium], however laudable, fashioned here by the bankruptcy court"). While rearing her daughter is consumptive of Murphy, nonetheless Murphy and her family fortuitously do not also share the additional burden of an insubstantial family income. Rather, because of her husband's successful employment, Murphy and her dependents enjoy an income well in excess of nearly all who seek an undue hardship discharge and a substantially more comfortable lifestyle than the minimal one contemplated by the *Brunner* criterion. While perhaps not entirely painless, Murphy can repay the remaining student loans of ECMC without inflicting serious financial burden upon herself or her family.

For the reasons expressed herein, the Court finds the ECMC loans are not discharged and the Complaint of Murphy is dismissed.

IT IS SO ORDERED.

It is further ORDERED that the Clerk shall direct a copy of this Memorandum Opinion and Order to Duncan R. St. Clair, counsel for Murphy, and to Rand L. Gelder, counsel for ECMC.